Dennis F. Dunne
Risa M. Rosenberg
Jeremy C. Hollembeak
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
Telephone: (212) 530-5000

Andrew M. Leblanc (*pro hac vice* pending)
MILBANK, TWEED, HADLEY & McCLOY LLP
1850 K Street, NW
Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

*Attorneys for Alejandro Francisco Sánchez-Mujica as*
*Foreign Representative of Vitro, S.A.B. de C.V.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>VITRO, S.A.B. de C.V.,<br><br>      Debtor in a Foreign Proceeding. | Chapter 15<br><br>Case No. 10-_____ (___) |

### DECLARATION OF ALEJANDRO FRANCISCO SÁNCHEZ-MUJICA, AS FOREIGN REPRESENTATIVE OF VITRO, S.A.B. DE C.V., (I) IN SUPPORT OF VERIFIED PETITION FOR RECOGNITION OF FOREIGN MAIN PROCEEDING AND REQUEST FOR RELATED RELIEF AND (II) IN COMPLIANCE WITH 11 U.S.C. § 1515 AND <u>RULE 1007(a)(4) OF FEDERAL RULES OF BANKRUPTCY PROCEDURE</u>

I, Alejandro Francisco Sánchez-Mujica, declare under penalty of perjury under the laws

of the United States of America that the following is true and correct:

1.      I am the duly appointed foreign representative (in such capacity, the "<u>Foreign</u>

<u>Representative</u>") of Vitro, S.A.B. de C.V. ("<u>Vitro SAB</u>" or the "<u>Debtor</u>"), a debtor in a voluntary

judicial reorganization proceeding (the "<u>Mexican Proceeding</u>") commenced on December 13,

2010, in the United States of Mexico under the *Ley de Concursos Mercantiles* (the "Mexican Business Reorganization Act") and currently pending in the Federal District Court for Civil and Labor Matters for the State of Nuevo León (the "District Court of Nuevo León"). As set forth more fully below, I am duly authorized to commence this chapter 15 case and to submit this declaration in support thereof (the "Declaration").

2.       In compliance with section 1515 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), I hereby respectfully submit this Declaration, in support of the Verified Petition for Recognition of Foreign Main Proceeding and Request for Related Relief dated December 14, 2010 (the "Verified Petition"), filed contemporaneously herewith. The Verified Petition seeks entry of an order (i) recognizing the Mexican Proceeding as a "foreign main proceeding" pursuant to sections 1515 and 1517 of the Bankruptcy Code and (ii) granting certain related relief pursuant to section 1520 of the Bankruptcy Code.

3.       This Declaration sets forth a description of Vitro SAB's business and material indebtedness, the circumstances surrounding the commencement of the Mexican Proceeding and the filing of the Verified Petition, including the factual bases for the relief requested therein.[1] Unless otherwise stated, I have personal knowledge of the facts hereinafter set forth. Although Spanish is my native language, I am fluent in English and have elected to execute and submit this Declaration in the English language.

---

[1]       Many of the facts set forth in this Declaration are set forth more fully in Vitro SAB's publicly filed Solicitation Statement dated November 1, 2010, attached hereto as Exhibit A (the "Nov. 1 Sol. Stmt." and, together with all supplements thereto, the "Solicitation Statement"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Solicitation Statement.

<u>**VITRO SAB'S BUSINESS**</u>

4.　　　　Vitro SAB is a corporation with variable capital (*sociedad anónima bursátil de capital variable*) organized under the laws of Mexico in 1909 and is a holding company that conducts substantially all of its operations through subsidiaries (collectively with such subsidiaries, "<u>Vitro</u>").  Vitro is the largest manufacturer of glass containers and flat glass in Mexico, with consolidated net sales in 2009 of Ps. 23,991 million ($1,837 million).  (<u>See</u> Nov. 1 Sol. Stmt. at 114.)  It has manufacturing facilities in 11 countries and distribution centers throughout the Americas and Europe, and exports its products to more than 50 countries worldwide.  (<u>See</u> Nov. 1 Sol. Stmt. at 114.)  In 2009, 46% of Vitro's consolidated net sales were made in Mexico, while an additional 46% were made in the United States and Europe.  (<u>See</u> Nov. 1 Sol. Stmt. at 114.)  Vitro's operations are organized into two operating business units: (1) the Glass Containers business unit and (2) the Flat Glass business unit, representing approximately 52% and 47%, respectively, of Vitro's consolidated net sales in 2009.  (<u>See</u> Nov. 1 Sol. Stmt. at 114.)  During 2009, Vitro maintained a workforce of approximately 17,000 worldwide, approximately 81% of whom were located in Mexico.[2]  (<u>See</u> Nov. 1 Sol. Stmt. at 138.)

**A.　　　　<u>Glass Containers Business</u>**

5.　　　　Vitro's Glass Containers business unit manufactures and distributes glass containers for the soft drink, beer, food, juices, wine and liquor, pharmaceutical and cosmetics industries, as well as raw materials, machinery and molds for the glass industry.  (<u>See</u> Nov. 1 Sol. Stmt. at 114.)  Based on its consolidated net sales of Ps. 12,385 million ($948 million) in 2009, the Glass Containers business unit is the largest glass container producer in Mexico and

---

[2]　　　　Substantially all such employees are employed by Vitro SAB's affiliates.

Central America and among the largest in the world.  (See Nov. 1 Sol. Stmt. at 114.)

Substantially all of Vitro SAB's Glass Containers subsidiaries are wholly owned except for

Empresas Comegua, S.A., a joint venture in which Vitro SAB holds an investment of 49.7%.

(See Nov. 1 Sol. Stmt. at 114.)

**B.**     **Flat Glass Business**

6.     Vitro's Flat Glass business unit focuses on the manufacturing, processing and

distribution of flat glass for the construction and automotive industries.  (See Nov. 1 Sol. Stmt. at

114.)  Based on its consolidated net sales of Ps. 11,377 million ($871 million) in 2009, the Flat

Glass business unit is the largest flat glass producer in Mexico, the second largest in Latin

America, one of the largest distributors of flat glass products in the United States and a leading

provider of insulated flat glass products in Spain and Portugal.  (See Nov. 1 Sol. Stmt. at 114.)

Viméxico, a joint venture in which Vitro SAB holds an investment of 91.8%, is a holding

company for some of the Flat Glass business unit subsidiaries.  (See Nov. 1 Sol. Stmt. at 114.)

In addition to Viméxico, Vitro SAB has partners in three additional subsidiaries: (i) Cristales

Automotrices, S.A. de C.V., which conducts Vitro's automotive glass replacement installation

business throughout México City, (ii) Vitro Cristalglass, which is engaged in the manufacturing

and distribution of flat glass products for the Spanish, French and Portuguese construction

industries, and (iii) Vitro Chaves Industria de Vidrio, S.A., a subsidiary of Vitro Cristalglass in

Portugal.  (See Nov. 1 Sol. Stmt. at 114.)

7.      As of September 30, 2010, Vitro's aggregate outstanding third party consolidated

indebtedness was approximately $1.981 billion,[4] consisting of:

- $1.216 billion in outstanding principal amount under the 2012 Notes, 2017 Notes and 2013 Notes (each as defined below and, together, the "Old Notes");

- $253 million relating to certain of Vitro SAB's and its subsidiaries' derivative financial instruments (including certain agreed upon amounts represented by promissory notes, the "DFI Claims");

- $59 million of debt consisting of the *Certificados Bursátiles* and the ABN Note (each as defined below and, together, the "Other Debt" and, together with the Old Notes and the DFI Claims, the "Restructured Debt");

- $268 million in past-due interest and unamortized discounts (together, the "Accrued Interest"); and

- $185 million of additional indebtedness that Vitro SAB does not plan to restructure or discharge in the Mexican Proceeding (the "Non-restructured Debt").

The circumstances giving rise to Vitro SAB's indebtedness with respect to the Restructured Debt

are discussed below.  In addition, as of September 30, 2010, Vitro SAB's aggregate outstanding

indebtedness to its direct or indirect subsidiaries (the "Intercompany Claims") was

approximately $1.91 billion.  (See Annex A to Nov. 12 Sol. Stmt. Supp. at A-4.)

**A.      Old Notes**

8.      On October 22, 2003 and on February 1, 2007, respectively, Vitro SAB issued

(i) $225 million aggregate principal amount of 11.75% Senior Notes due 2013 (the "2013

Notes"), and (ii) $1.0 billion of Senior Notes, comprised of $300 million aggregate principal

---

[3]     Certain of Vitro SAB's indebtedness is denominated in pesos.  Throughout this Declaration, except as expressly set forth in pesos, solely for purposes of presenting Vitro SAB's indebtedness in U.S. dollars, such indebtedness has been converted at a rate of 12.5011 pesos per one U.S. dollar, the Free Exchange Rate as of September 30, 2010.

[4]     See Solicitation Statement Supplement dated November 12, 2010 (attached hereto as Exhibit B, the "Nov. 12 Sol. Stmt. Supp."), at 8.

amount of 8.625% Senior Notes due 2012 (the "2012 Notes") and $700 million aggregate

principal amount of 9.125% Senior Notes due 2017 (the "2017 Notes") under separate indentures

(as each has been supplemented as of the date hereof, collectively, the "Indentures"). (See

Nov. 12 Sol. Stmt. Supp. at 23-24.) The Old Notes are general unsecured obligations of Vitro

SAB, guaranteed, on an unsecured basis, by more than fifty of Vitro SAB's wholly-owned direct

and indirect subsidiaries (in such capacities, the "Old Guarantors"). (See Nov. 12 Sol. Stmt.

Supp. at 23-24.)

**B.    DFI Claims**

9.      As discussed above, Vitro is an international enterprise, receiving the majority of

its cash inflows from operations in currencies other than the U.S. dollar. As a result, it has

significant exposure to fluctuations in the interest and currency exchange-rates caused by its

commitments on U.S. dollar-denominated indebtedness. Additionally, because of the large

energy requirements of its manufacturing operations, it also has significant exposure to

fluctuations in the price of natural gas, its main energy input. To mitigate these exposures, and

in response to market trends during the first seven months of 2008,[5] Vitro SAB and certain of its

subsidiaries (collectively, the "Vitro DFI Parties") entered into certain derivative financial

instruments (the "DFIs"), including (i) interest rate swap agreements to hedge future interest

payments, (ii) currency swap and option agreements to hedge exposure to foreign currency

exchange rate variations and (iii) forwards and other derivative agreements to hedge its exposure

to natural gas price variations. (See Nov. 1 Sol. Stmt. at 25.) By the fourth quarter of 2008, the

DFI positions of the Vitro DFI Parties had been materially and adversely impacted by the high

volatility in commodity and currency markets in the second half of 2008, forcing the Vitro DFI

---

[5]       During this period, the Mexican peso appreciated 7.4% relative to the U.S. dollar, the Mexican equilibrium
interbank interest rates ("TIIE") increased 6.5%, and natural gas prices recorded a sharp price increase, all
of which exerted negative pressure on Vitro's operating and financial results. (See Nov. 1 Sol. Stmt. at 25.)

Parties to unwind the majority of their open positions in the fourth quarter of 2008.[6]  The DFI

Claims are the result of the Vitro DFI Parties' defaults under the DFIs in early 2009.

**C.**     **Other Debt**

10.     On February 13, 2003, Vitro SAB issued a *Certificados Bursátiles* note (the

"*Certificados Bursátiles Vitro 03*") at an annual floating interest rate of 3.25% over the rate on

182-day *Certificados de la Tesorería de la Federación* (i.e., notes issued by the government of

Mexico).  (See Nov. 12 Sol. Stmt. Supp. at 24.)  On July 2, 2008, Vitro SAB issued another

*Certificados Bursátiles* note (the "*Certificados Bursátiles Vitro 08*" and, together with the

*Certificados Bursátiles Vitro 03*, the "*Certificados Bursátiles* ") at an annual floating interest rate

of 2.50% over the 28-day TIIE.  (See Nov. 12 Sol. Stmt. Supp. at 24.)  As of September 30,

2010, the aggregate principal amount outstanding under the *Certificados Bursátiles Vitro 03* and

*Certificados Bursátiles Vitro 08* was Ps. 150 million ($12.0 million) and Ps. 400 million ($32.0

million), respectively.  (See Nov. 12 Sol. Stmt. Supp. at 24.)  The *Certificados Bursátiles* are

senior unsecured obligations of Vitro SAB.

11.     On September 29, 2008, Vitro SAB issued a promissory note (the "ABN Note")

in favor of ABN Amro Bank N.V. ("ABN") in the principal amount of $15 million.  (See Annex

A to Nov. 12 Sol. Stmt. Supp. at A-3.)

**EVENTS PRECIPITATING COMMENCEMENT OF MEXICAN PROCEEDING**

**A.**     **Global Recession**

12.     The global economic and financial crisis, and the severe economic recession

which began in the second half of 2008, affected each of Vitro's major markets, Mexico, the

---

[6]         Specifically, between July 2008 and December 2008, natural gas prices plummeted more than 50%, and the
Mexican peso registered a 30% devaluation against the U.S.  dollar, reversing the appreciation trend
experienced in the first seven months of the year and making it substantially more expensive for Vitro to
service its U.S. dollar-denominated debt.  (See Nov. 1 Sol. Stmt. at 25.)

United States and Spain, and significantly affected its businesses.  The sharp decline in demand for new cars and trucks in the automobile industry, for new homes and buildings in the construction industry and reduced beer bottle demand from the main client of Vitro's Glass Containers unit resulted in a 36.8% decline in Vitro's consolidated operating income for 2008 compared to 2007, from Ps. 2,704 million to Ps. 1,710 million, and a further 22.3% decline in Vitro's operating income for 2009 compared to 2008, from Ps. 1,710 million to Ps. 1,329 million.  (See Nov. 1 Sol. Stmt. at 24.)  Income before taxes decreased from Ps. 175 million in 2007 to a loss of Ps. 7,857 million in 2008 and a loss of Ps. 1,352 million in 2009.  (See Nov. 1 Sol. Stmt. at 24.)  Net income decreased from Ps. 131 million in 2007 to a loss of Ps. 5,682 million in 2008 and a loss of Ps. 754 million in 2009.  (See Nov. 1 Sol. Stmt. at 24.)  Even though the economy has shown moderate signs of recovery in 2010, some of Vitro's markets are still experiencing contraction and excess capacity, including the construction sector in the United States and Spain.  For the nine-month period ended September 30, 2010, Vitro's consolidated net sales decreased 4.8% to Ps. 17,498 million ($1,400 million) from Ps. 18,389 million ($1,471 million) for the same period ended September 30, 2009.  (See Nov. 12 Sol. Stmt. Supp. at 18.)

**B.      DFI Litigation**

13.      As discussed above, in the second half of 2008, the DFI positions of the Vitro DFI Parties were materially and adversely impacted by the high volatility in commodity and currency markets, resulting in margin calls by its DFI counterparties ("Counterparties") forcing the Vitro DFI Parties to post $85 million in collateral deposits.  (See Nov. 1 Sol. Stmt. at 25.)  To eliminate further liquidity deterioration related to additional margin calls, in the fourth quarter of 2008, the Vitro DFI Parties restructured their DFI portfolio and unwound the majority of their

open positions to guarantee their ability to continue their normal course of operations. (See Nov. 1 Sol. Stmt. at 25.)

14.     In January 2009, four Counterparties served notices on the applicable Vitro DFI Parties of their default under the relevant DFIs based on the failure to pay approximately $293 million allegedly due thereunder. Over the next 30 days, six Counterparties commenced actions (collectively, the "DFI Litigation")[7] against such Vitro DFI Parties in the Supreme Court of the State of New York demanding payment of approximately $240.3 million plus interest and fees allegedly payable under the DFIs. (See Nov. 1 Sol. Stmt. at 25.) On April 13, 2010, the Supreme Court of New York granted these Counterparties' motions as to the Vitro DFI Parties' liability and referred the matter of damages to a special referee. (See Nov. 1 Sol. Stmt. at 25.)

## C.     Default under Old Notes and Other Debt

15.     Vitro's defaults under the DFIs resulted in events of default under each Indenture, enabling the trustee or the registered holders of 25% or more in principal amount of each issue of the Old Notes to declare such notes immediately due and payable. To preserve cash necessary to continue its business operations, Vitro SAB stopped interest making payments on the Old Notes, beginning with a $45 million coupon due on February 2, 2009 on the 2012 Notes and 2017 Notes. (See Nov. 1 Sol. Stmt. at 26.) Since that time, Vitro SAB has not made the scheduled interest payments on the 2012 Notes and 2017 Notes due August 2009, February 2010 and August 2010, or those on the 2013 Notes due May 2009, November 2009, May 2010 and November 2010. (See Nov. 1 Sol. Stmt. at 26.)

---

[7]     The DFI Litigation includes actions by (i) Credit Suisse International, initiated on January 30, 2009 (Index No. 09-600298); (ii) Citibank, N.A., initiated on February 06, 2009 (Index No. 09-600376); (iii) Calyon Credit Agricole CIB ("Calyon"), initiated on February 10, 2009 (Index No. 09-600407) (the "Calyon Litigation"); (iv) Barclays Bank PLC, initiated on February 18, 2009 (Index No. 09-600521); (v) Deutsche Bank AG, initiated on February 26, 2009 (Index. No. 09-600612); and (vi) Merrill Lynch Capital Services, Inc., initiated on February 27, 2009 (Index No. 09-600634).

16.     Vitro SAB also did not make a scheduled payment of Ps. 150 million ($11.9 million), plus accrued interest, due February 5, 2009 on the *Certificados Bursátiles Vitro 03*.  (See Nov. 1 Sol. Stmt. at 26.)  Subsequently, the common representative (*representante común*) of the *Certificados Bursátiles* initiated legal proceedings thereon against Vitro SAB in Mexico that is still pending.  (See Nov. 1 Sol. Stmt. at 26.)

17.     In July 2009, ABN commenced a lawsuit against Vitro SAB and certain of its subsidiaries in Mexico, demanding payment of the ABN Note.  (See Nov. 1 Sol. Stmt. at 54.)  A first instance judgment was entered in that action against Vitro SAB, but in September 2010, the Mexican appellate court vacated that judgment and ordered the proceedings to be restarted.  (See Nov. 1 Sol. Stmt. at 54.)

**D.     Restructuring Process and Negotiations**

18.     As a result of all of the foregoing, in February 2009, Vitro SAB announced its intention to restructure all of the Restructured Debt.  (See Nov. 1 Sol. Stmt. at 26.)  In connection therewith, Vitro SAB retained Rothschild Inc. as financial advisor and engaged in a series of transactions in an effort to strengthen its liquidity and maintain normal operations during the restructuring process.  (See Nov. 1 Sol. Stmt. at 26-28.)  As discussed further below, Vitro has also engaged in active negotiations with certain holders of the Old Notes, the DFI Claims and the Other Debt.

**i.     Negotiations with Steering Committee**

19.     Since February 2009, Vitro SAB has engaged in good faith negotiations with various parties, including the *ad hoc* committee of the holders of the Old Notes (the "Steering Committee") and its advisors regarding a potential restructuring.  Unfortunately, those negotiations did not result in an agreement, with the Steering Committee rejecting three restructuring proposals from Vitro SAB between August 2009 and July 2010.  (See Nov. 1 Sol.

Stmt. at 28.)  Instead, in January of 2010, certain holders of the Old Notes (including several members of the Steering Committee) served Vitro SAB with notices of acceleration in respect of the 2012 Notes and 2017 Notes.  (See Nov. 1 Sol. Stmt. at 28.)  Nevertheless, Vitro SAB continued to negotiate with the Steering Committee in the hope of reaching a consensual resolution.  However, the continued recalcitrance of the members of the Steering Committee, in conjunction with certain other developments (including the adverse rulings in the DFI Litigation and the acceleration of the 2013 Notes in April 2010) led Vitro SAB to explore alternative means to implement a restructuring.

### ii.    Settlement of DFI Litigation and Negotiations with Fintech

20.    On June 7, 2010, the relevant Vitro DFI Party, Vitro Envases Norteamérica, S.A. de C.V. ("VENA"), reached a settlement agreement with Calyon, one of the Counterparties that had commenced the DFI Litigation, pursuant to which Calyon agreed to dismiss the Calyon Litigation in exchange for a payment of approximately $67.3 million.  (See Nov. 1 Sol. Stmt. at 25.)  Vitro SAB intends to continue negotiating with Calyon to include this settlement amount in the Restructured Debt, but has not yet reached an agreement allowing it to do so.

21.    The other five Counterparties that had commenced the DFI Litigation sold their DFI Claims to Fintech Investments Ltd. (together with any affiliate and/or investment vehicle thereof, "Fintech").  (See Nov. 1 Sol. Stmt. at 25.)  The only Counterparty that had not commenced litigation against Vitro SAB also sold its DFI Claim to Fintech.  (See Nov. 1 Sol. Stmt. at 25.)  Thereafter, Vitro SAB engaged in settlement negotiations with Fintech and, as a result, on September 3, 2010, reached a settlement (the "Settlement and Debt Acknowledgment Agreement") whereby, among other things, Fintech agreed to dismiss the DFI Litigation in exchange for promissory notes in the aggregate amount of approximately $189 million issued by the three relevant Vitro DFI Parties, Compañía Vidriera, S.A. de C.V. ("COVISA"),

Comercializadora Álcali, S.A. de C.V. ("COMALI") and VENA, and guaranteed by Vitro SAB. (See Annex A to Nov. 12 Sol. Stmt. Supp. at A-3.) On November 3, 2010, with the consent of Fintech, COVISA, COMALI and VENA assigned the Settlement and Debt Acknowledgement Agreement to Vitro SAB, which, in turn, issued a single promissory note with three scheduled payments due on January 31, 2011, February 28, 2011 and March 31, 2011, in replacement of the promissory notes issued on September 3, 2010.

22. Vitro SAB also engaged in negotiations with Fintech with respect to the restructuring proposal Vitro SAB had formulated for the Steering Committee in July 2010. As a result of those negotiations, Vitro SAB agreed to make substantial changes to the July 2010 proposal for the benefit of all holders of Restructured Debt. (See Nov. 1 Sol. Stmt. at 28.)

### iii. Formulation of *Concurso* Plan

23. The restructuring proposal resulting from the negotiations with Fintech (as amended from time to time, the "*Concurso* Plan")[8] was to be effectuated through an exchange offer and consent solicitation followed by a prepackaged voluntary judicial reorganization proceeding in Mexico. Fintech agreed to enter into a lock-up and plan support agreement (the "Fintech Lock-Up Agreement") in respect of all of the Restructured Debt it then held or subsequently acquired (including the Old Notes, the DFI Claims and the Other Debt), and to provide financing for the Tender Offer (as defined below).

24. Vitro does not have the means to repay the Restructured Debt. Nor does it believe that it will be able to find a material source of financing to refinance the Restructured Debt, including the Old Notes. (See Nov. 1 Sol. Stmt. at 23.) Thus, the principal objectives of the *Concurso* Plan are to lower Vitro SAB's principal and interest payments on, and extend the

---

[8]    A true and correct copy of the *Concurso* Plan is attached hereto as Exhibit C, and an English translation thereof is attached hereto as Exhibit D.

maturity dates of, the Old Notes and the other Restructured Debt.  (See Nov. 1 Sol. Stmt. at 23.)

The completion of  restructuring through the *Concurso* Plan is critical to resolving Vitro SAB's

liquidity crisis and ensuring its continued viability, while providing a fair recovery to the holders

of Restructured Debt.  (See Nov. 1 Sol. Stmt. at 23.)

### iv.    Launch of Tender Offer and Exchange Offer and Consent Solicitation

25.    On November 1, 2010, Vitro SAB launched two alternative offers to the holders

of the Old Notes: a tender offer to purchase the Old Notes (the "Tender Offer") and an exchange

offer and solicitation of consents to an in-court restructuring under the Mexican Business

Reorganization Act (the "Exchange Offer and Consent Solicitation" and, together with the

Tender Offer, the "Offers").  Concurrently, Vitro SAB also sought consents to the *Concurso* Plan

from the other holders of Restructured Debt.[9]  The expiration of both Offers was extended at the

request of certain holders of Old Notes to facilitate their participation therein.  While the Tender

Offer expired on December 7, 2010, the Exchange Offer and Consent Solicitation is currently

scheduled to expire at 5:00 p.m. (New York City time) on December 21, 2010. (See Press

Release dated December 8, 2010 (the "Dec. 8, 2010 Press Release"), attached hereto as Exhibit

E).[10]

### a.  *Tender Offer*

26.    Pursuant to the Tender Offer, Vitro SAB and Administración de Inmuebles Vitro,

S.A. de C.V. ("AIV"), a wholly-owned subsidiary of Vitro SAB, offered to purchase, for cash,

the maximum aggregate principal amount of the Old Notes that could be purchased for

$100,000,000 at a purchase price (the "Tender Offer Consideration") per $1,000 principal

---

[9]       See, e.g., Nov. 12 Sol. Stmt. Supp. at 7 (describing solicitation of consents from holders of *Certificados Bursátiles*).

[10]      FTI Consulting was appointed to act as independent financial advisor to act on behalf of the holders of Old Notes that may wish to consult with them in matters related to the Offers.  (See Solicitation Statement Supplement dated November 29, 2010 at 1, attached hereto as Exhibit F.)

amount of no less than $500 but no more than $575 (as determined pursuant to a modified Dutch auction, the "Clearing Price"). (See Nov. 1 Sol. Stmt. at 148.)

27.     Pursuant to a loan agreement with AIV (the "Loan Agreement"), Fintech agreed to provide the funds for the Tender Offer Consideration. The Loan Agreement provides that, as consideration for providing these funds, Fintech will receive the tendered Old Notes, which it will thereafter exchange pursuant to the Exchange Offer and Consent Solicitation, receiving the corresponding Consent Payment (as defined below). (See Nov. 1 Sol. Stmt. at 22-23)

### b. Exchange Offer and Consent Solicitation

28.     Pursuant to the Exchange Offer and Consent Solicitation, Vitro SAB has offered those holders of the Old Notes that participated in the Exchange Offer and Consent Solicitation or otherwise entered into lock-up agreements or consented to the *Concurso* Plan (the "Participating Creditors"), a cash consent payment (the "Consent Payment") equal to each Participating Creditor's *pro rata* share of $75.0 million held in a Mexican trust (the "Payment Trust").[11] (See Nov. 1 Sol. Stmt. at 24.) All holders of the Old Notes who become Participating Creditors are deemed to have consented to the proposed *Concurso* Plan as it may be amended in the course of the Mexican Proceeding (as so amended, the "*Convenio Concursal*"). (See Nov. 1 Sol. Stmt. at 24.)

### v.     Recoveries under *Concurso* Plan

29.     Under the *Concurso* Plan, on the Issue Date,[12] the Restructured Debt will be exchanged for the following consideration:

- $850 million in aggregate principal amount of unsecured notes due 2019;[13]

---

[11]     The Consent Payment paid to any Participating Creditor will in no event be less than 5% or greater than 10% of the aggregate principal amount of the Restructured Debt held by such Participating Creditor. (See Nov. 1 Sol. Stmt. at 24)

[12]     Subject to certain qualifications described in the Solicitation Statement, the Issue Date is expected to occur on or about the date the *Convenio Concursal* is consummated. (See Nov. 1 Sol. Stmt. at 6.)

- $100 million (plus the Issue Date Adjustment) in aggregate principal amount of new convertible debt obligations, which will mandatorily convert into 15% of Vitro SAB's equity interests (on a fully diluted basis) if not paid in full at maturity or upon the occurrence of certain events of default;[14]

- a cash payment (the "Restructuring Cash Payment") in an amount equal to the balance of $75.0 million held in the Payment Trust remaining after the making of the Consent Payments; and

- a cash restructuring fee to be determined as described in the Solicitation Statement (the "Restructuring Fee" and, together with the New Notes and the Restructuring Cash Payment, the "Restructuring Consideration").[15]

(See Nov. 1 Sol. Stmt. at 23 and Nov. 12 Sol. Stmt. Supp. at 7.)

30. Based on the foregoing, under the *Concurso* Plan, for every $1,000 of the principal amount of the Restructured Debt exchanged, the holders thereof will be entitled to receive:

- $561 principal amount of New 2019 Notes or New *Certificados Bursátiles*, as applicable;

- $66 principal amount of New MCDs or New *Obligaciones Convertibles en Acciones*, as applicable (not including the Issue Date Adjustment);

- a *pro rata* portion of the Restructuring Cash Payment; and

- a *pro rata* portion of the Restructuring Fee.

31. Additionally, Vitro SAB's obligations under the New 2019 Notes, including any repurchase obligation resulting from a Change of Control and other mandatory prepayment

---

[13] These notes, which will be identical in all material respects, will consist of new notes due in 2019 (the "New 2019 Notes") to be issued in exchange for the Old Notes, and new *Certificados Bursátiles* (the "New *Certificados Bursátiles*") to be issued in exchange for *Certificados Bursátiles*.

[14] These obligations, which will be identical in all material respects, will consist of new mandatorily convertible debentures (the "New MCDs") to be issued in exchange for the Old Notes, and new *Obligaciones Convertibles en Acciones* (the "New *Obligaciones Convertibles en Acciones*" and, together with the New 2019 Notes, New *Certificados Bursátiles*, and New MCDs, the "New Notes") to be issued in exchange for *Certificados Bursátiles*.

[15] Subject to the occurrence of the Issue Date, holders of the Restructured Debt will receive their *pro rata* share of the Restructuring Consideration (including the Restructuring Cash Payment and Restructuring Fee) regardless of whether or not they were Participating Creditors. The holders of Intercompany Claims will not receive any Restructuring Consideration on account of such claims. (See Nov. 1 Sol. Stmt. at 23.)

provisions thereunder, on the Issue Date, will be unconditionally guaranteed (the "New Guarantees"), jointly and severally, on an unsecured basis, by Vitro SAB's direct and indirect subsidiaries that are currently guarantors of the Old Notes (each, a "New Guarantor").[16]

32.    In exchange for the Restructuring Consideration and the New Guarantees, the *Concurso* Plan provides for the cancelation of all obligations of Vitro SAB and its subsidiaries with respect to the Restructured Debt (including all Accrued Interest and all guarantee obligations of the Old Guarantors), regardless of whether or not any particular holder of the Restructured Debt voted to accept the *Concurso* Plan.

33.    Vitro SAB believes that, as a result of the implementation of the *Concurso* Plan through the Mexican Proceeding, the holders of the Restructured Debt will recover 68% to 75% of the face value of their respective claims.[17]  With respect to the Old Notes, as explained in the Solicitation Statement:

> [Vitro SAB] believe[s] that the proposed *Concurso* Plan represents a significantly enhanced recovery for Holders relative to the recovery they could potentially achieve through litigation and higher than the average market price of the Old Notes for the last twelve months.

(See Nov. 1 Sol. Stmt. at 30).

34.    Vitro SAB and AIV have been advised by the depository that, as of the expiration of the Tender Offer, an aggregate principal amount of approximately $44 million of Old Notes had been tendered pursuant to the Tender Offer, at a Clearing Price of $575.  (See Dec. 8, 2010 Press Release.)  Additionally, although the Exchange Offer and Consent Solicitation has not expired, Vitro SAB has been advised that, as of December 7, 2010, consents obtained through

---

[16]    See Nov. 1 Sol. Stmt. at 218-219 (complete list of the New Guarantors).

[17]    See November 1, 2010 Release ("Vitro Announces Offers for its Outstanding Senior Notes," attached hereto as Exhibit G).

the Exchange Offer and Consent Solicitation, together with consents obtained through lock-up agreements, represent approximately 32% of the Restructured Debt.  (See Dec. 8, 2010 Press Release.)

E.    **Litigation Commenced by Members of Steering Committee**

35.    The Steering Committee has opposed the Offers.  In fact, ***six days prior*** to the launch of the Offers, the Steering Committee issued a press release urging the holders of the Old Notes not to participate in Vitro SAB's proposed restructuring and denouncing the yet-to-be-publicly-disclosed terms of the *Concurso* Plan as allegedly providing an "unacceptably poor economic outcome" for the holders of the Old Notes.  (See October 26, 2010 Release ("Ad Hoc Committee of Noteholders Reject Vitro's Initial Consent Solicitation"), attached hereto as Exhibit H).  Thereafter, several members of the Steering Committee initiated various legal proceedings in multiple jurisdictions against Vitro.

        **i.    Commencement of Involuntary Chapter 11 Cases
               Against Vitro SAB's U.S. Subsidiaries**

36.    Fifteen of Vitro SAB's indirect U.S. subsidiaries are Old Guarantors with respect to Vitro SAB's payment obligations under the Old Notes (in such capacity, the "Old U.S. Guarantors").  However, under the terms of the Indentures, the obligations of the Old Guarantors are only triggered when demand is made on them.[18]  No such demand has been made on the Old U.S. Guarantors and, accordingly, the Old U.S. Guarantors are not in default with respect to their obligations under the Old Notes and are generally paying their debts as they become due. Nevertheless, on November 17, 2010 -- less than two weeks before Vitro SAB was scheduled to conclude the Offers and commence the Mexican Proceeding -- four members of the Steering

---

[18]    See 2013 Indenture § 11.01; 2012 Indenture § 10.01 and 2017 Indenture § 10.01.

Committee (the "Dissident Minority Noteholders"),[19] representing a mere 6% of the principal

amount of the Old Notes,[20] filed involuntary chapter 11 petitions against the Old U.S. Guarantors

(in such capacities, the "Alleged U.S. Debtors") in the United States Bankruptcy Court for the

Northern District of Texas (the "Texas Court").  The involuntary cases (the "U.S. Involuntary

Cases") are being jointly administered before The Honorable Russell F. Nelms under Case No.

10-47470.

37.     From the outset, the Dissident Minority Noteholders used the U.S. Involuntary

Cases as a thinly-veiled attempt to disrupt the Offers and the *Concurso* Plan and thereby obtain

leverage in Vitro SAB's restructuring.  On November 18, 2010, one day after filing the

involuntary petitions, the Dissident Minority Noteholders filed a motion, pursuant to section

303(f) of the Bankruptcy Code (the "303(f) Motion"), requesting restrictions on the Alleged U.S.

Debtors' ability to engage in transactions with their foreign affiliates or participate in Vitro

SAB's restructuring.  The Texas Court denied the 303(f) Motion, finding, among other things,

that the Dissident Minority Noteholders failed to demonstrate that any harm would result from

the Alleged U.S. Debtors' participation in the Offers or the *Concurso* Plan, and that the Dissident

Minority Noteholders' unsubstantiated allegations and expressed distrust of Mexican law failed

---

[19]     The Dissident Minority Noteholders are: (1) Knightland Master Fund, L.P., (2) Brookville Horizons Fund, L.P., (3) Davidson Kempner Distressed Opportunities Fund L.P., and (4) Lord Abbett Bond-Debenture Fund, Inc.

[20]     As represented in each involuntary petition, the Dissident Minority Noteholders hold, in the aggregate, approximately $75 million in face amount of Vitro SAB's $1.216 billion of Old Notes.  (See, e.g., Involuntary Petition against Vitro Asset Corp., attached hereto as Exhibit I.)  Separately, counsel to the Steering Committee (which also serves as counsel to the Dissident Minority Noteholders) filed in the U.S. Involuntary Cases a Verified Statement pursuant to Bankruptcy Rule 2019, indicating that the nine members of the Steering Committee (including the four Dissident Minority Noteholders) purport to hold, in the aggregate, approximately $673 million of the Old Notes.  (See Verified Statement of White & Case LLP, attached hereto as Exhibit J.)  To date, however, none of the other members of the Steering Committee has joined the Dissident Minority Noteholders in the involuntary petitions pursuant to section 303(c) of the Bankruptcy Code, or made the required disclosures pursuant to Bankruptcy Rule 1003 to become a petitioning creditor in the U.S. Involuntary Cases.

to justify the requested relief.  (See Transcript of November 24, 2010 Bench Ruling at 11:13-16, 7:20-23, attached hereto as Exhibit K.)

38.     In addition, on November 22, 2010, the Dissident Minority Noteholders filed a motion pursuant to Bankruptcy Rule 2004 (the "2004 Motion") followed by a barrage of formal discovery requests, seeking expedited depositions and production of documents in less than one week over the Thanksgiving holiday.  On December 1, 2010, the Texas Court denied the majority of the Dissident Minority Noteholders' requests, but permitted limited discovery and a single deposition relating to the determination of whether the Alleged U.S. Debtors were generally not paying their debts as they become due.  (See Transcript of December 1, 2010 Hearing at 26:19-28-4, attached hereto as Exhibit L.)

39.     On December 9, 2010, the Alleged U.S. Debtors filed a joint answer to the involuntary petitions, denying most allegations therein and asserting certain affirmative defenses, including that the claims of the Dissident Minority Noteholders are contingent as to liability and subject to a *bona fide* dispute as to liability or amount, that the Alleged U.S. Debtors are generally paying their debts as they become due, and that, pursuant to section 305(a)(1) of the Bankruptcy Code, the interests of creditors would be better served by dismissal of the U.S. Involuntary Cases.  To date, no order for relief has been entered in the U.S. Involuntary Cases. A status conference is scheduled to take place in the Texas Court on December 20, 2010 at 9:30 a.m. (Fort Worth time).

### ii.     Filing of Involuntary Mexican Petitions

40.     On December 7, 2010, the Steering Committee released a statement to the press asserting that certain of its members had filed petitions (the "Involuntary Mexican Petitions") in Mexican District Court seeking the opening of involuntary reorganization proceedings against Vitro SAB and certain of its Mexican subsidiaries.  To the best of my knowledge, Vitro SAB has

never been served with any Involuntary Mexican Petition.  Furthermore, on information and belief, I understand that the Involuntary Mexican Petitions have been dismissed.

### iii.    Litigation Commenced in New York State Court

41.    On December 2, 2010, three funds managed or controlled by the Steering Committee member Aurelius Capital Management, LP (collectively, "Aurelius") commenced an action (the "Aurelius Action") in the Supreme Court of the State of New York (the "New York Court") against Vitro SAB and 49 of its subsidiaries (alleged guarantors of the Old Notes) for breach of contract and payment of accelerated principal and accrued interest on its Old Notes.[21] Aurelius also made an *ex parte* application for a pre-judgment order of attachment with respect to any property of Vitro SAB and the other defendants in the Aurelius Action located in the State of New York sufficient to secure the damages claim asserted by Aurelius.[22]  On December 3, 2010, Justice Shirley Werner Kornreich granted an order (the "Aurelius Order of Attachment"), which was served on Vitro SAB on December 7, 2010, directing the Sheriff of the City of New York to "levy upon" any such property.[23]  As a result of the Aurelius Order of Attachment, D.F. King & Co., Inc., which is acting as the Depositary for the Tender Offer and Information and Exchange Agent for the Exchange Offer and Consent Solicitation, has determined that it could not give the direction to The Depository Trust Company to distribute the cash deposited

---

[21]    See Verified Complaint of ACP Master, Ltd., Aurelius Capital Master, Ltd., and Aurelius Convergence Master, Ltd., Index No. 652146/2010 (the "Aurelius Complaint"), attached hereto as Exhibit M.  Aurelius alleges that it holds, in the aggregate, more than $206 million in face amount of Old Notes, and seeks damages in the aggregate amount of more than $257 million for unpaid principal and accrued interest.  (See Aurelius Complaint ¶ 1.)

[22]    See Memorandum of Law in Support of Plaintiffs' Ex Parte Application for Order of Attachment, attached hereto as Exhibit N.

[23]    By its terms, the Aurelius Order of Attachment applied to "[a]ny tangible and intangible property (whether real or personal, whether presently existing or hereinafter arising) located in the State of New York that could be assigned or transferred" excluding "any property that is owned by or in the possession or custody of any of the [Alleged U.S. Debtors] unless an until [the U.S. Involuntary Cases] are dismissed."  (See Aurelius Order of Attachment at 4, a copy of which is attached hereto as Exhibit O.)

therewith for the consummation of the Tender Offer and the making of the Consent Payments until it receives further guidance from the New York Court as to whether such distribution will violate the terms of the Aurelius Order of Attachment, and has refused to give such direction. A hearing with respect to the continued effectiveness of the Aurelius Order of Attachment has been scheduled before Justice Kornreich on December 16, 2010.

42.     On December 9, 2010, two funds managed or controlled by the Steering Committee member Elliott Management Corp. (collectively, "Elliott") commenced another action (the "Elliott Action") in the New York Court against the same defendants and seeking the same relief as the Aurelius Action.[24] It is my understanding that, on December 10, 2010, Justice Kornreich granted an order (the "Elliott Order of Attachment"), granting substantially similar relief to Elliott as was provided in the Aurelius Order of Attachment. To the best of my knowledge, as of the filing of this Declaration, Vitro SAB has not been served with the Elliott Order of Attachment, but a hearing with respect to the continued effectiveness of the Elliott Order of Attachment has been scheduled before Justice Kornreich on December 16, 2010.

43.     The U.S. Involuntary Cases, the Aurelius Action and the Elliott Action have caused significant disruption to Vitro in the weeks leading up to the long-anticipated commencement of the Mexican Proceeding, requiring Vitro to expend significant resources on litigation in the United States instead of concentrating all efforts on the Mexican restructuring process. It is my understanding and belief, based on the prior actions and public statements of the Steering Committee and certain holders of the Old Notes, that notwithstanding the commencement of the Mexican Proceeding, Vitro SAB (prior to recognition by this Court of the

---

[24]     See Verified Complaint of Elliott International L.P. and The Liverpool Limited Partnership, Index No. 652223/2010 (the "Elliott Complaint"), attached hereto as Exhibit P. Elliott alleges that it holds, in the aggregate, more than $85 million in face amount of Old Notes, and seeks damages in the aggregate amount of more than $106 million for unpaid principal and accrued interest. (See Elliott Complaint ¶ 1.)

Mexican Proceeding) and the Old Guarantors may continue to be subjected to precipitous legal actions, including the attempted attachment of assets of the Old Guarantors located in the United States, or the filing of foreign involuntary insolvency proceedings. Accordingly, in conjunction with the filing of the Verified Petition, Vitro SAB is seeking a temporary restraining order ("TRO") protecting itself and the Old Guarantors (other than the Old U.S. Guarantors) from any additional legal actions by holders of Restructured Debt. It is my belief that, absent entry of the TRO, such actions, if commenced, threaten irreparable harm to Vitro SAB's ability to reorganize under the *Concurso* Plan.

## COMMENCEMENT OF MEXICAN PROCEEDING

44. On December 13, 2010, to effectuate its proposed restructuring as contemplated by Exchange Offer and Consent Solicitation, Vitro SAB filed a petition (the "*Concurso* Petition") and prepackaged *Concurso* Plan under the Mexican Business Reorganization Act with the District Court of Nuevo León.

## FILING OF VERIFIED PETITION AND BASIS
## FOR RECOGNITION OF MEXICAN PROCEEDING

45. On the date hereof, I commenced this case by filing a form chapter 15 petition (the "Form Petition") and the Verified Petition with this Court. For the reasons set forth herein, I believe the Mexican Proceeding should be recognized by this Court as a foreign main proceeding, and that Vitro SAB is entitled to the rights and protections incident to such recognition pursuant to chapter 15 of the Bankruptcy Code.

46. It is my understanding that, pursuant to section 101 of the Bankruptcy Code, a "foreign proceeding" is defined as a "collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of

debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation." 11 U.S.C. § 101(23).

47.     Counsel has advised me that the Mexican Proceeding is a judicial proceeding relating to insolvency or the adjustment of debt pursuant to which the assets and affairs of Vitro SAB are subject to the control and supervision of the District Court of Nuevo León for the purpose of reorganization or liquidation.[25]  Accordingly, I believe that the Mexican Proceeding is a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code.

48.     Counsel has further advised me that, pursuant to section 1502 of the Bankruptcy Code, a "foreign main proceeding" is "a foreign proceeding pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1502(4).

49.     In my opinion, Vitro SAB has its center of main interests in Mexico.  As set forth above, Vitro SAB is organized under the laws of Mexico.  In operating its business, Vitro SAB maintains primary and substantial connections to Mexico as follows:

- its principal place and mailing address is located in Av. Ricardo Margain Zozaya # 400, Col. Valle del Campestre, San Pedro Garza García, N.L. México, 66265;

- it is managed and controlled from its principal place of business;

- all members of its board of directors (the "Board of Directors") reside in Mexico; and

- all administrative functions, including accounting, financial reporting, budgeting and cash management, are conducted in Nuevo León, Mexico.

50.     Accordingly, I believe the Mexican Proceeding is a "foreign main proceeding" within the meaning of sections 1502(4) and 1517(b)(1) of the Bankruptcy Code.

---

[25]     Concurrently with the filing of the Verified Petition and this Declaration, a Declaration in support of the Verified Petition is being filed by Vitro SAB's Mexican Counsel setting forth a description of the applicable provisions of the Mexican Business Reorganization Act, as they apply to the Mexican Proceeding, and comparing them to similar provisions of the Bankruptcy Code.

51.     Counsel has advised me that, pursuant to section 101 of the Bankruptcy Code, "foreign representative" is a "person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24).

52.     In accordance with section 1515 of the Bankruptcy Code, (a) I have attached hereto (i) as Exhibit Q, a certified copy of the voluntary petition filed by Vitro SAB with the District Court of Nuevo León, (ii) as Exhibit R, an English translation of the voluntary petition filed by Vitro SAB with the District Court of Nuevo León, and (iii) as Exhibit S, a certified copy of an English translation of the Board Resolution appointing me as the Foreign Representative of Vitro SAB; and (b) I hereby declare that the Mexican Proceeding is the only insolvency proceeding of any kind pending for Vitro SAB of which I am aware and, thus, is the only known "foreign proceeding" with respect to Vitro SAB, as that term is defined in section 101(23) of the Bankruptcy Code.

53.     In accordance with Bankruptcy Rule 1007(a)(4)(A), I filed a corporate ownership statement containing the information described in Bankruptcy Rule 7007.1 with the Form Petition.

54.     In accordance with Bankruptcy Rule 1007(a)(4)(B), I also submit the following:

**i.     Administrators in the Mexican Proceeding**

As discussed above, the Mexican Proceeding was commenced by the filing of the *Concurso* Petition in the District Court of Nuevo León on December 13, 2010. No administrator has yet been appointed in the Mexican Proceeding. No later than five business days following the appointment of any administrator in the Mexican Proceeding, I will supplement this

Declaration with the requisite disclosure of the names and addresses of any such administrator(s).

### ii. Parties to Litigation in the United States in Which Vitro SAB is Party

As noted above, Vitro SAB is currently party to litigation in the United States with the following parties:

- ACP Master, Ltd.
- Aurelius Capital Master, Ltd.
- Aurelius Convergence Master, Ltd.
- Elliott International L.P.
- The Liverpool Limited Partnership

### iii. Entities Against Whom Provisional Relief is Sought Under Section 1519 of the Bankruptcy Code

Concurrently herewith, Vitro SAB has commenced an adversary proceeding seeking a temporary restraining order and preliminary injunctive relief against the indenture trustees for the Old Notes, Does 1 through 1000, who, upon information and belief, are holders of the Old Notes and other creditors of Vitro SAB with respect to the Restructured Debt.

55. I submit that this Declaration satisfies the requirements of section 1515 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 1007(a)(4).

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 13th day of December, 2010
in Monterrey, Mexico

/s/ Alejandro Francisco Sánchez-Mujica
Alejandro Francisco Sánchez-Mujica

Foreign Representative for the Debtor